11-2332-cv
Southern New England Telephone Company v. Comcast

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2012

(Argued:  September 12, 2012                    Decided: May 1, 2013)

Docket No. 11-2332-cv

_____

SOUTHERN NEW ENGLAND TELEPHONE COMPANY D/B/A AT&T, CONNECTICUT,

*Plaintiff-Appellant*,

v.

COMCAST PHONE OF CONNECTICUT, INC., CABLEVISION LIGHTPATH-CONNECTICUT, INC.,
COX CONNECTICUT TELECOM, LLC,

*Intervenors-Defendants-Appellees*,

METROPCS NEW YORK, LLC, SPRINT COMMUNICATIONS, L.P., SPRINT SPECTRUM, L.P., NEXTEL
COMMUNICATIONS OF THE MID-ATLANTIC, INC., AND YOUGHIOGHENY COMMUNICATIONS
NORTHEAST, LLC D/B/A POCKET COMMUNICATIONS,

*Intervenors-Defendants-Appellees*, *and*

ANTHONY J. PALERMINO, COMMISSIONER, CONNECTICUT DEPARTMENT OF PUBLIC UTILITY
CONTROL, KEVIN M. DELGOBBO, COMMISSIONER, CONNECTICUT DEPARTMENT OF PUBLIC
UTILITY CONTROL, JOHN W. BETOSKI, III, COMMISSIONER, CONNECTICUT DEPARTMENT OF
PUBLIC UTILITY CONTROL,

*Defendants-Appellees.*

Before:  POOLER, B.D. PARKER AND WESLEY, *Circuit Judges*.
_____

Appeal from a judgment of the United States District Court for the District of Connecticut
(Eginton, *J.*).  We affirm the district court's determination that Appellant is obligated to provide
Appellees with transit traffic service under the Telecommunications Act of 1996 at regulated
rates.  We further affirm the district court's reversal of an order requiring Appellant to apply
regulated rates to all of its contracts for the provision of transit traffic service.

**AFFIRMED.**

_____

Timothy P. Jensen, Hinckley, Allen & Snyder LLP, Hartford, CT; Theodore A. Livingston, Dennis G. Friedman, J. Tyson Covey, Mayer Brown LLP, Chicago, IL, *for Petitioner-Appellant,*

Clare Kindall, Assistant Attorney General, New Britain, CT, *for Defendants-Appellees.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:


**INTRODUCTION**


This appeal requires us to determine whether the Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104-104, 110 Stat. 56 (codified in part at 47 U.S.C. §§ 251-261), obligates former telecommunications monopolists, known as Incumbent Local Exchange Carriers ("ILECs"), to provide a connection service known as transit traffic service ("transit service") at negotiated rates or at lower regulated rates to new entrants seeking to exchange traffic with each other through the ILEC's facilities. We agree with the United States District Court for the District of Connecticut (Edginton, *J.*) that the regulated rates apply.

The TCA transformed the "longstanding regime of state-sanctioned monopolies" into a competitive market. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999). Prior to its passage, ILECs held state-granted franchises to act as exclusive telephone service providers and, after its passage, they continue to control the physical network infrastructure in most states. *See id.*; 47 U.S.C. § 251(h)(1). Plaintiff-Appellant Southern New England Telephone Company, d/b/a AT&T Connecticut ("AT&T"), is an ILEC in Connecticut.

2

New entrants, known as Competitive Local Exchange Carriers ("CLECs"), entered the market after deregulation. They now compete with ILECs to provide services, but they lack some of the advantages that the ILECs enjoy due to the ILECs' historical ownership of network infrastructure. Intervenors-Defendants-Appellees Comcast Phone of Connecticut, Inc., Cablevision Lightpath-Connecticut, Inc., and Cox Connecticut Telecom, LLC are CLECs. Commercial mobile radio services ("CMRSs") are new entrants who offer wireless communication and compete with both ILECs and CLECs to provide telephone service. Intervenors-Defendants-Appellees MetroPCS New York, LLC, Sprint Communications, L.P., Sprint Spectrum, L.P., Nextel Communications of the Mid-Atlantic, Inc., and Youghiogheny Communications Northeast, LLC d/b/a Pocket Communications ("Pocket Communications") are CMRSs.

To advance Congress' goals of promoting competition and widespread user access to telecommunications services, section 251(a) of Title 47 of the United States Code requires all telecommunications carriers to "interconnect," that is physically link their facilities for the mutual exchange of traffic. 47 U.S.C. § 251(a); 47 C.F.R. § 51.5. In requiring universal interconnection, the TCA aims to ensure that the customers of all carriers will be able to exchange telecommunications traffic with each other. In addition, §§ 251(c)(2) and 252(d)(1) require ILECs, like AT&T, to physically connect all other carriers to their network facilities at regulated or Total Element Long-Run Incremental Cost ("TELRIC") rates.[1] 47 U.S.C. §§ 251(c)(2), 252(d)(1). In requiring ILECs to provide interconnection to the facilities of new entrants, the

---

[1]    TELRIC rates are based on the cost to the supplier, are determined without reference to a rate-of-return and may include a reasonable profit. 47 U.S.C. § 252(d).

3

TCA seeks to ensure that ILECs do not exploit their former monopoly status and their continuing control of network infrastructure to the disadvantage of CLECs.

Interconnection may be direct, where a carrier attaches his equipment to the physical network infrastructure of another carrier, or indirect, where "the attachment occurs through the facilities or equipment of an additional carrier." *In the Matters of Deployment of Wireline Servs. Offering Advanced Telecomms. Capability and Implementation of the Local Competition Provisions of the Telecomms. Act of 1996*, 15 F.C.C.R. 17806, 17845 n.198 (2000). Typically, two new entrants use an ILEC's network to interconnect indirectly. *In the Matter of Dev'g a Unified Intercarrier Comp. Regime*, Further Notice of Proposed Rulemaking, 20 F.C.C.R. 4685, 4737 (2005) ("Notice 2005"). When carriers are directly interconnected, they are able to exchange traffic. However, when they are indirectly interconnected, they must rely on and pay the interconnecting carrier to route the traffic between them.

The principal question in this appeal is whether AT&T, an interconnecting carrier, is obligated under § 251(c)(2) to provide this routing of traffic, or transit service, at lower TELRIC rates or whether AT&T is permitted to charge higher negotiated rates. Most new entrants interconnect indirectly and transit service is essential to ensuring that indirectly interconnected entrants can exchange traffic. It would be inconsistent with the stated purpose of the TCA to allow AT&T to charge higher negotiated rates for this service because this would impose additional costs and competitive disadvantages upon new entrants. Such an imposition would allow AT&T to further exploit its status as a former monopolist. Thus, we conclude that the provision of transit service falls under AT&T's obligation as an ILEC and that the service must be delivered at regulated rates.

**Procedural History**

*DPUC Decision*

In December 2008, Pocket Communications petitioned the Connecticut Department of Public Utility Control ("DPUC") to review a commercial agreement it was negotiating with AT&T. The main disagreement in that proceeding ("Pocket Proceeding") was over the rates that AT&T could charge Pocket for transit service. Pocket alleged that AT&T violated Connecticut statutory law and the DPUC's 2003 decision in a proceeding under the TCA involving Cox Communication, both of which required AT&T to charge regulated rates for transit service. Pocket Petition, at 12; *see also* Decision, Conn. Dep't of Pub. Util. Control, *Petition of Cox Connecticut Telecom, LLC for Investigation of SNET's Transit Service Cost Study and Rates*, No. 02-01-23 (Jan. 15, 2003) ("Cox Decision"). Pocket argued that the rates AT&T charged for transit service in Connecticut were significantly higher than those it charged in other states and requested that the Commission order them to be lowered. AT&T argued that because transit service did not constitute interconnection under § 251, it was subject to higher negotiated rates. The DPUC concluded that AT&T was required to offer transit service at regulated rates and ordered that those rates be afforded not only to Pocket but to other AT&T transit service customers as well. Decision, Conn. Dep't of Pub. Util. Control, *Petition of Youghioghney Communications Northeast, LLC*, No. 08-12-04, at 42 (Oct. 7, 2009) ("Pocket Decision").

AT&T appealed to the district court on a number of grounds. It first argued preemption: the DPUC was not authorized to regulate transit service because the FCC had occupied the area by examining but not resolving the question. According to AT&T, this inaction was tantamount to a decision not to regulate transit service. AT&T also argued that because transit service did not

fit the definition of interconnection under § 251, it was not subject to TELRIC rates. Finally, AT&T argued that under Connecticut law the DPUC was not authorized to regulate telecommunications service rates by issuing declaratory rulings.

*District Court Decision*

The district court affirmed in part and reversed and remanded in part. It held that the DPUC's determination was not preempted by the FCC's comments. Agreeing with the DPUC, it concluded that "interconnection under section 251(c) includes the duties to provide indirect interconnection and to provide transit service" because "[t]he 1996 Act and its attendant regulations should be interpreted so as to promote competition" and it would be difficult for CLECs to compete without transit service which allows them to connect indirectly. *S. N. Eng. Tel. Co. v. Perlermino*, No. 3:09-CV-1787 (WWE), 2001 WL 1750224, at *12 (D. Conn. May 6, 2011). Therefore, the district court affirmed the DPUC's ruling ordering AT&T to provide transit service to Pocket Communications at regulated rates. However, the district court also held that the DPUC's order requiring AT&T to extend regulated pricing to CLECs who were not parties to the proceeding was impermissible because that approach would short-circuit voluntary negotiation, the preferred rate-setting method under the TCA. This appeal followed. We review *de novo* a district court's decision as to whether a state commission's order complies with federal law. *Global NAPs, Inc. v. Verizon New Eng., Inc.*, 454 F.3d 91, 96 (2d Cir. 2006). For the reasons that follow, we affirm the district court.

**DISCUSSION**

**I.**

The ultimate question for us is whether AT&T is obligated to provide transit service pursuant to the interconnection obligations of § 251. This requires us to decide whether the obligation arises under § 251(a), which addresses the general duties of all telecommunications carriers, or under § 251(c), which addresses the duties of former monopolists. This distinction is significant because the interconnection obligations under § 251(a) are subject to higher negotiated rates, while those under § 251(c) are to be fulfilled at significantly lower, regulated rates.

But first, we must decide two threshold issues: (1) whether a state commission is preempted from determining that transit service is among the obligations imposed on carriers by § 251 when the FCC has considered, but not yet made, this determination, and (2) whether a state commission may interpret the TCA in proceedings other than those specified in § 252. AT&T also contends separately that, under Connecticut law, the DPUC was not authorized to resolve this dispute in a proceeding seeking a declaratory ruling.

The FCC's comments and inaction relating to transit service do not preempt the DPUC here. "The model under the TCA is to divide authority among the FCC and the state commissions in an unusual regime of 'cooperative federalism,' with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states." *Global Naps, Inc.*, 427 F.3d at 46 (internal citation omitted). While "under cooperative federalism, federal and state agencies should endeavor to harmonize their efforts with one another" and "state commissions are directed by provisions of the Act and FCC regulations in making decisions," the

7

TCA "gives the state commissions latitude to exercise their expertise in telecommunications and needs of the local market." *Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 352 (6th Cir. 2003) (quoting Philip J. Weiser, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U. L. Rev. 1692, 1724 (2001)).

Accordingly, Congress included a savings clause in the TCA to protect state experimentation with interconnection obligations. In that regard, "Congress expressly left with the states the power to enforce 'any regulation, order, or policy of a State commission that . . . establishes access and interconnection obligations of local exchange carriers; . . . is consistent with the requirements of this section; and . . . does not substantially prevent implementation of the requirements of this section and the purposes of this part.'" *Global Naps, Inc.*, 427 F.3d at 46 (quoting 47 U.S.C. § 251(d)(3)(A)-(C)). The TCA, then, permits state commissions to regulate interconnection obligations so long as they do "not violate federal law and until the FCC rules otherwise." *See Iowa Network Servs., Inc. v. Qwest Corp.*, 466 F.3d 1091, 1097 (8th Cir. 2006).

Although the FCC has been considering the regulation of transit services for a number of years, it has not yet adopted a final position.[2] In its most recent pronouncement, the FCC recognized that while it has yet to determine whether to regulate transit service, a number of state commissions and courts have done so.[3] *In the Matter of Connect Am. Fund,*

---

[2]     *See In the Matter of Connect Am. Fund et al.,* Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, 26 F.C.C.R. 4554, 4776 (2011) ("Notice 2011"); *In re Connect Am. Fund, A Nat'l Broadband Plan for Our Future et al.,* Report and Order and Further Notice of Proposed Rule-Making, 26 F.C.C.R. 17663, 18114 (2011)*; In re High-Cost Universal Serv. Support*, 24 F.C.C.R. 6475, 6650 (2008); Notice 2005, 20 F.C.C.R. 4685, 4737.

[3]     At least sixteen state commissions in addition to the DPUC have exercised their regulatory authority under the Act to determine that ILECs must provide transit traffic service at regulated rates. *See Petition for Arbitration of the Interconnection Agreement Between BellSouth Telecomm., Inc. and Intermedia Commc'ns., Inc.*, Ala. Pub. Serv. Comm'n, No. 99-00948, Order, at 122 (July 11, 2000); *In the Matter of Telcove Investment, LLC's Petition for Arbitration,* Ark. Pub. Serv. Comm'n, No. 04-167-U, Order No. 10, at 37 (Sept. 15, 2005);

*A Nat'l Broadband Plan for Our Future et al.,* Report and Order and Further Notice of Proposed Rule-Making, 26 F.C.C.R. 17663, 18114 (2011) (" Report and Order 2011"). In light of these factors, we have little difficulty concluding that with regard to transit service Congress did not intend to preempt state regulation, the text of the TCA does not support preemption, and the FCC's indecision simply reflects its current preference for continued experimentation by state commissions.

We next consider whether the DPUC exceeded its authority when it resolved the dispute between the parties, which arose under a commercial agreement and not an interconnection agreement ("ICA"). AT&T contends that when it reviewed the commercial agreement between

*Petition of Level 3 Commc'ns, LLC (U-5941-C) for Arbitration*, Cal. Pub. Utils. Comm'n, Final Arbitrator's Report, No. 04-06-004, at 42 (Feb. 8, 2005); *Application by Pacific Bell Telephone Company d/b/a SBC California (U 1001 C) for Arbitration*, Cal. Pub. Utils. Comm'n, No. 05-05-027, Decision 06-08-029, at 9 (Aug. 24, 2006); *Joint Petition by TDS Telecom d/b/a TDS Telecom/Quincy Telephone, Order on BellSouth Telecomms., Inc.'s Transit Traffic Service Tariff*, Fla. Pub. Serv. Comm'n, Order No. PSC-06-0776-FOF-TP, Nos. 05-119-TP and 05-0125-TP, at 17 (Sept. 18, 2006); *Level 3 Commc'ns., L.L.C Petition for Arbitration,* Ill. Commerce Comm'n, No. 04-0428, Admin. Law Judge's Proposed Arbitration Decision (Dec. 23, 2004); *In the Matter of Level 3 Commc'ns, LLC's Petition for Arbitration*, Ind. Utils. Reg. Comm'n, No. 42663 INT-01, at 12 (Dec. 22, 2004); *In the Matter of Arbitration Between Level 3 Commc'ns, LLC and SBC Commc'ns, Inc.*, Kan. Corp. Comm'n, No. 04-L3CT-1046-ARB, at 283 (Feb. 2, 2005); *Joint Petition for Arbitration of NewSouth Commc'ns Corp., NUVOX Commc'ns, Inc. KMC Telecom V. Inc., KMC Telecom III LLC, and Xspedius Commc'ns, LLC on Behalf of its Operating Subsidiaries Xspedius Management Co. Switched Services, LLC, Xspedius Management Co. of Lexington, LLC and Xspedius Management Co. of Louisville, LLC of an Interconnection Agreement with BellSouth Telecomms., Inc.*, Ky. Pub. Serv.Comm'n, No. 2004-00044, at 22 (Sept. 26, 2005); *Petitions of MediaOne Telecommunications of Massachusetts, Inc. and New England Telephone and Telegraph Company d/b/a Bell Atlantic-Massachusetts for arbitration*, Mass. Dep't of Telecomm. and Energy, Nos. 99-42/43, 99-52, at 122 (Aug. 25, 1999); *In the Matter of the Petition of Michigan Bell Telephone Company, d/b/a SBC Michigan, for Arbitration of Interconnection Rates, Terms, and Conditions and Related Arrangements with MCIMetro Access Transmission Services, LLC*, Mich. Pub. Serv. Comm'n, No. U-13758, at 46 (Aug. 18, 2003); *Application of Chariton Valley Comms. Corp., Inc., for Approval of an Interconnection Agreement with Southwestern Bell Telephone, L.P. d/b/a SBC Missouri*, Mo. Pub. Serv.Comm'n, Order Rejecting Interconnection Agreement, No. TK-2005-0300 (May 29, 2005); *Petition of Socket Telecom LLC for Compulsory Arbitration of Interconnection Agreements with CenturyTel of Mo., LLC and Spectra Comms., LLC*, Mo. Pub. Serv. Comm'n, No. TO-2006-0299, at 47 (June 27, 2006); *In the Matter of the Application of Cox Nebraska Telecom, LLC, Omaha*, Neb. Pub. Serv. Comm'n, No. C-3796, Order Approving Agreement, at 3 (Jan. 29, 2008); *In the Matter of Joint Petition of NewSouth Comms. Corp. for Arbitration with BellSouth Telecommunications, Inc.*, N.C. Utils. Comm'n, No. P-772, Sub 8, P-913, Sub 5, P-989, Sub 3, P-824, Sub 6, P-1202, at 131 (July 26, 2005); *In the Matter of the Establishment of Carrier-to-Carrier Rules*, Pub. Utils. Comm'n of Ohio, No. 06-1344-TP-ORD, at 92-93 (Aug. 22, 2007).

AT&T and Pocket Communications, the DPUC exceeded its limited role under § 252, which permits it only to mediate, arbitrate or approve ICAs.  Rep. Br. at 3.  The DPUC contended below that it is aware that it has no power to review commercial agreements, but that it was authorized to reach its decision because transit service must be regulated under § 251 and, therefore, must be negotiated in an ICA.  Brief of Appellee at 16, S. New Eng. Tel. Co. v. Palermino, No. 09-cv-1787 (D. Conn Feb. 5, 2010), ECF No. 53.

The enforcement role of state commissions in matters arising under § 251 is set out primarily in § 252 which authorizes state commissions to mediate, arbitrate and approve ICAs. *See* 47 U.S.C. § 252(a)-(e).  The TCA contemplates that when a new entrant requests interconnection from an ILEC, the two parties will undertake to reach an agreement through voluntary negotiation.  *See* 47 U.S.C. § 252(a)(1).  The resulting voluntarily-negotiated ICAs are not subject to the detailed, specific interconnection obligations of § 251(c).  *See id.* If negotiations fail, the parties can petition their state commission to either mediate or arbitrate the open issues in their ICAs.  *See* 47 U.S.C. 252(a)(2)-(b); *AT&T Corp.*, 525 U.S. at 371-73.  Where a commission undertakes to arbitrate open issues, it must ensure that the resolution of these issues complies with § 251(c) and that former monopolies charge TELRIC rates when they provide interconnection. 47 U.S.C. § 252(c).

All ICAs, whether negotiated by the parties or mediated or arbitrated, must be approved by a state commission.  *See* 47 U.S.C. § 252(e)(1).  Negotiated agreements and arbitrated agreements are subject to different approval criteria.  The former may be rejected only if they discriminate against carriers not party to the agreement or are inconsistent with "public interest, convenience and necessity."  47 U.S.C. § 252(e)(2)(A).  The latter may be rejected if they do not

10

meet the interconnection and other requirements of § 251(c) or pricing standards under § 252(d). 47 U.S.C. § 252(e)(2)(B). When approving negotiated or arbitrated ICAs, a commission may review the agreement for compliance with state law. *See* 47 U.S.C. § 252(e)(3) ("nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements").

Moreover, where parties seek clarification as to whether a contractual agreement is subject to § 252(a)(1), the FCC has ruled that "[b]ased on their statutory role provided by Congress and their experience to date, state commissions are well positioned to decide on a case-by-case basis whether a particular [negotiated] agreement is required to be filed as an 'interconnection agreement' and, if so, whether it should be approved or rejected." *In the Matter of Qwest Comm'ns Int'l Inc., Petition for Declaratory Ruling on the Scope of the Duty to File and Obtain Prior Approval of Negotiated Contractual Arrangement under Section 252(a)(1)*, Memorandum Opinion and Order, 17 F.C.C.R. 19337, 19341 (2002). Therefore, state commissions "should determine in the first instance which sorts of agreements shall fall within the scope of the statutory standard" under § 252. *Id*. at 19342.

In this case, the DPUC made such a determination. It reviewed the commercial agreement between AT&T and Pocket Communications and concluded that "negotiations for [transit service] should have been conducted with [the carriers] pursuant to 47 U.S.C. [§] 252," resulting in an interconnection agreement subject to DPUC approval. Pocket Decision, at 36. This is consistent with the FCC's view that state commissions are authorized to determine whether negotiated agreements must be field as ICAs under § 252. However, as the DPUC acknowledges,

state commissions do not have the authority to order changes in commercial agreements affecting services that are not subject to § 252. *Id*. at 41. Additionally, the DPUC's review of the Pocket agreement here was authorized by its previous ruling, in the Cox Proceeding, that transit service should be regulated under § 251.

**II.**

Next, AT&T contends that the DPUC failed to follow state law and consequently exceeded its authority when it issued binding orders under Conn. Gen. Stat. § 4-176, which provides that

> [a]ny person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency.

Conn Gen. Stat. § 4-176(a). The DPUC contends that § 4-176(a) authorizes the result reached in the case. AT&T argues that an action under § 4-176(a) allows the DPUC only to issue non-binding advisory opinions and that the DPUC exceeded its authority under that statute because it issued binding generic orders in a declaratory proceeding.

The district court did not comment on this pendant state law claim, and AT&T failed to argue that the district court abused its discretion when it declined this exercise of supplemental jurisdiction. Because "principles of federalism and comity" instruct us to leave unresolved questions of state law to the states "where those questions concern the state's interest in the administration of its government," we do not think that the district court abused its discretion by passing on this issue. *Valencia v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (internal quotation marks and citation omitted); *see also* 28 U.S.C. § 1367(c). Likewise, we will not consider it here in the first instance or remand for the district court to reconsider.

12

We note that Neutral Tandem LLC, a CLEC transit service provider that contributed an amicus brief in this action, is currently litigating this issue in state court. *See* Complaint, Neutral Tandem-N.Y., LLC v. Dep't of Pub. Util. Control, No. CV-09-6002233-S (Conn. Super. Ct. Nov. 18, 2009). That action is stayed pending the resolution of this appeal. *See* Report of the Parties, Neutral Tandem-N.Y., LLC v. Dep't of Pub. Util. Control, No. CV-09-6002233-S (Conn. Super. Ct. June 15, 2012). We believe that this question, arising under Connecticut law, is appropriately considered in the first instance by its courts.

**III.**

We next consider whether AT&T is obligated under the TCA to provide transit service at either TELRIC or negotiated rates. The dispositive question is whether transit service falls under the ILECs' interconnection obligations set out in § 251(c)(2). As noted above, all telecommunications carriers must interconnect either directly or indirectly, and ILECs must provide direct interconnection to other carriers at regulated rates. *See* 47 U.S.C. §§ 251(a)(1), 252(d)(1)(A)(i).

Transiting occurs when two carriers that are directly interconnected with a third "intermediary" carrier, but not with each other, "exchange non-access traffic by routing the traffic through [the] intermediary carrier's network." Notice 2011, 26 F.C.C.R. 4554, 4776. Typically, the intermediary carrier is an ILEC and the transited traffic is routed from one CLEC through the ILEC's facilities to the other CLEC. Notice 2005, 20 F.C.C.R. 4685, 4737. "The intermediary . . . . carrier then charges a fee for use of its facilities." *Id*. While, as we have noted, the FCC has not yet determined whether to regulate transit service under § 251, reflecting on the importance of transit service, the Commission has found that

13

the availability of transit service is increasingly critical to establishing indirect interconnection–a form of interconnection explicitly recognized and supported by the Act. It is evident that [CLECs] . . . often rely upon transit service from the [ILECs] to facilitate indirect interconnection with each other. Without the continued availability of transit service, carriers that are indirectly interconnected may have no efficient means by which to route traffic between their respective networks.

*Id*. at 4740 (footnote omitted).

The FCC has defined indirect interconnection as occurring when "two non-incumbent LECs interconnect[] with an incumbent LEC's network." *In the Matter of Implementation of the Local Competition Provisions in the Telecomms Act of 1996*, 11 F.C.C.R. 15499, 15991 (1996). The FCC has also stated that CLECs may satisfy their duties to interconnect pursuant to § 251(a)(1) through indirect interconnection. *Id*. ("Given the lack of market power by telecommunication carriers required to provide interconnection via section 251(a), and the clear language of the statute, we find that indirect connection . . . satisfies a telecommunications carrier's duty to interconnect pursuant to section 251(a)."). Consequently, two CLECs satisfy their interconnection obligations under § 251(a) when they are both physically linked with one ILEC. Given the dominance of ILECs over physical infrastructure, most CLECs may interconnect with each other only indirectly. Notice 2005, 20 F.C.C.R. 4685, 4737.

Without transit service, two CLECs will be connected physically to AT&T, but will not be able to exchange traffic. They sustain an additional cost, one not imposed on ILECs, to facilitate "the mutual exchange of traffic" as required in the definition of interconnection. *See* 47 C.F.R. § 51.5. Such additional cost, and resulting competitive disadvantage, would be inconsistent with the TCA's stated objective, which is "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced

14

telecommunication and information technologies and services to all Americans by opening all telecommunications markets to competition . . . ." H.R. Rep. No. 104-458, at 1 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 124. "In determining the legislative intent, our duty is to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment . . . ." *Nat'l Petroleum Refiners Ass'n. v. FTC*, 482 F.2d 672, 689 (D.C. Cir. 1973) (internal citation omitted). "In the absence of an unmistakable directive, we cannot construe the Act in a manner which runs counter to the broad goals which Congress intended it to effectuate." *Id.* (internal quotation marks, citation and alteration omitted). Consequently, we find that transit service is an ILEC obligation under § 251(c) because it ensures that indirect interconnection facilitates the mutual exchange of traffic between new entrants in the market.

AT&T argues that even if it can be construed as essential to indirect interconnection, transit service obligations can only fall under § 251(a), which addresses indirect interconnection, and that consequently CLECs must bear the full cost of the service. Appellant's Br. at 29. We disagree. Section 251(a) merely requires that all ILECs interconnect, and CLECs may do so indirectly. However, under § 251(c) an ILEC *must* provide interconnection for a CLEC's facilities and equipment "for the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2)(A). Therefore, an ILEC must provide transit service when a CLEC interconnects with a third carrier. Without transit service, the indirect interconnection between two CLECs could not be used "for the transmission and routing of telephone exchange service and exchange access." *Id*. An ILEC could frustrate the flow of traffic and prevent carriers from indirectly interconnecting, rendering the language in § 251(a), which mandates indirect interconnection, meaningless.

AT&T further points to the FCC's definition of interconnection as the "linking of two networks for mutual exchange of traffic" in arguing that interconnection for the mutual exchange of traffic can only refer to the exchange of traffic between the carrier whose customer originates the call and the second carrier that terminates the call to one of its customers. Appellant's Br. at 27-28. Consequently, AT&T argues, because transit service does not involve AT&T end-users, we must conclude that it cannot constitute an interconnection obligation under § 251.

However, nothing in the language of § 251 suggests that the interconnection duty relates only to the transmission and routing of traffic between a CLEC and the ILEC's end-users. The FCC has ruled that carriers have the right to interconnect to exchange traffic that does not originate or terminate on their own networks. *See In the Matter of Time Warner Cable Request for Declaratory Ruling that Competitive Local Exchange Carriers May Obtain Interconnection Under Section 251 of the Commc'ns Act of 1934*, as Amended, to Provide Wholesale Telecomms. Servs. to VoIP Providers, Memorandum, Opinion and Order, 22 F.C.C.R. 3513 (2007). The FCC has also found that interconnection obligations under § 251 apply in favor of paging carriers who do not originate traffic. *TSR Wireless, LLC v. U.S. W. Commc'ns, Inc.*, Memorandum Opinion and Order, 15 F.C.C.R. 11166 (2000). Therefore, the obligations associated with interconnection are not limited to situations where AT&T terminates the traffic.

**IV.**

Finally, we conclude that the district court correctly determined that the DPUC's imposition of regulated rates on all of AT&T's transit traffic service contracts is not permitted.

The district court found this order to be arbitrary and capricious because it short-circuited voluntary negotiation under § 252(a). Congress' preference for negotiated resolutions, reflected in § 252, is clear. We join several other circuits in concluding that attempts by state utility commissions to set cost-based pricing for all carriers in proceedings to which they are not parties is incompatible with the negotiated agreement provision of § 252(a). *See Verizon New. Eng., Inc. v. Me. Pub. Utils. Comm'n*, 509 F.3d 1, 9 (1st Cir. 2007); *Wis. Bell, Inc. v. Bie*, 340 F.3d 441, 445 (7th Cir. 2003); *Pac. Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1127 (9th Cir. 2003)*; Verizon N., Inc. v. Strand*, 309 F.3d 935, 939-44 (6th Cir. 2002).

# CONCLUSION

The judgment of the district court is **affirmed**.