SPRINT COMMUNICATIONS COMPANY Plaintiff,

v.

Robert B. BERNSTEN, Krista Tanner, and Darrell Hanson, in their official capacities as members of the Iowa Utilities Board, Defendants.

v.

Windstream Iowa Communications, Inc., Office of Consumer Advocate, Intervenors.

No. 11–cv–183–JAJ

United States District Court, S.D. Iowa, Central Division.

Filed 12/30/2015

Jared P. Marx, Christopher J. Wright, Mark D. Davis, Timothy J. Simeone, Harris, Wiltshire & Grannis LLP, Washington, DC, Bret Alan Dublinske, Fredrikson & Byron, P.A., Des Moines, IA, for Plaintiff.

David Jay Lynch, Mary Frances Whitman, Iowa Utilities Board, Des Moines, IA, for Defendants.

Andrew R. Anderson, Todd P. Langel, Faegre Baker Daniels, LLP, Mark R. Schuling, Anna K. Ryon, Iowa Department of Justice Consumer Advocate, Des Moines, IA, Gregory J. Vogt, Law Offices of Gregory J. Vogt, PLLC, Black Mountain, NC, for Intervenors.

## ORDER

JOHN A. JARVEY, Chief Judge,
UNITED STATES DISTRICT COURT

Mediacom has historically offered its customers the ability to make telephone calls over the Internet. That technology is called "Voice over Internet Protocol," or VoIP. One difficulty with VoIP is that traffic sent over the internet is formatted differently than traffic sent over ordinary telephone lines.[1] Without something to convert Internet formatting to telephone formatting, Mediacom's customers could not call telephone users. Sprint Communications provided that conversion service. When a Mediacom customer placed a VoIP call, Mediacom passed that traffic to Sprint. Sprint changed its format, and then delivered it to telephone lines owned by Windstream Iowa Communications. Sprint paid Windstream to use the lines. It paid at rates set by a tariff that Windstream had filed with the Iowa Utilities Board, in accordance with Iowa law.

In 2009, Sprint stopped paying Windstream for that use, and started with-

---

1. Internet traffic is in Internet Protocol format, while telephone traffic is in Time Division Multiplexing format.

holding payments for other services. It argued that it had been overpaying Windstream: it should have been paying rates determined by federal law, because state law had been preempted. The Iowa Utilities Board heard the dispute, and found in Windstream's favor. It ordered Sprint to pay what it owed Windstream under state law. Sprint sued the Board's members in this Court, arguing that the Board's order was contrary to federal law and seeking declaratory and injunctive relief. Windstream and the Office of Consumer Advocate intervened as defendants, and all parties have agreed on the material facts and moved for summary judgment.

## I. Legal and Historical Background

### A. The Communications Act Era

Commercial telephone service in the United States. began as a monopoly: Alexander Graham Bell's telephone company held all the key patents. Peter W. Huber, et. al., *Federal Telecommunications Law,* § 1.3 (2d ed. Supp.2011); *AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 402, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (Thomas, J., concurring in part and dissenting in part). Even after the patents expired, the Bell company maintained its dominance by refusing to carry telephone traffic from independent telephone companies. Huber, *Federal Telecommunications,* at § 1.3; *AT & T Corp.,* 525 U.S. at 403, 119 S.Ct. 721 (Thomas, J., concurring in part and dissenting in part). The Communications Act of 1934 enshrined the monopolistic approach, requiring telephone carriers to get permission from the new Federal Communications Commission before operating a new telephone line or acquiring an old one. 47 U.S.C. § 214(a); *see also F.C.C. v. RCA Communications,* 346 U.S. 86, 92–93, 73 S.Ct. 998, 97 L.Ed.

1470 (1953) (describing the extent of and reasons for the Act's limitations on competition). This system left Bell in control of the telephony market.[2] Huber, *Federal Telecommunications,* at § 1.3.4.

The Act gave the F.C.C. other regulatory powers, but limited its jurisdiction to "interstate and foreign communication." 47 U.S.C. § 152(a). The F.C.C. had no authority over "services ... for or in connection with intrastate communication." 47 U.S.C. § 152(b); *see also Louisiana Public Service Com'n v. F.C.C.,* 476 U.S. 355, 360, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) ("[T]he Act would seem to divide the world of domestic telephone service neatly into two hemispheres—one comprised of interstate service, over which the F.C.C. would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction.")

A communication was classified as either interstate or intrastate based on an "end-to-end" analysis. *In the Matter of Vonage Holdings Corporation,* 19 F.C.C. Rcd. 22404, 22413 (2004). If a call both began and ended within a state, it was intrastate; if it ended in a different state or in a foreign country, it was interstate. *Id.* If a service enabled both intra- and interstate calls, it was "jurisdictionally mixed." *Id.* Usually both the F.C.C. and the states regulated "mixed" services, the states regulating their intrastate components and the F.C.C. their interstate components. *Id.* But if the intrastate and interstate components could not be disentangled, the F.C.C. could preempt state regulation and regulate unilaterally. *Louisiana Public,* 476 U.S. at 375 n. 4, 106 S.Ct. 1890; *Public Service Com'n of Maryland v. F.C.C.,* 909 F.2d 1510, 1515 (D.C.Cir.1990). That rule

---

**2.** Although the monopoly system was referred to as the "Bell System," the company's name was American Telephone and Telegraph Company, and its corporate descendant is today known as "AT & T."

was called the "impossibility exception." *People of State of Cal. v. F.C.C.,* 905 F.2d 1217, 1243 (9th Cir.1990).

The impossibility exception is relevant to this case because it applied to some VoIP services. VoIP services come in two varieties: nomadic and fixed. *Minnesota Public Utilities Com'n v. F.C.C.,* 483 F.3d 570, 575 (8th Cir.2007). Nomadic VoIP services can be used anywhere "in the universe" the user can get an Internet connection. *Id.* Fixed VoIP services require equipment installed at a specific location, like a cable connection, to work. *Id.* The F.C.C. decided to exercise exclusive jurisdiction over one nomadic VoIP service, because the end points of those calls could not be determined. *Vonage Holdings Corporation,* 19 F.C.C. Rcd. 22404, 22424 (2004). The parties debate that decision's breadth.

## B. Moving Beyond Bell

The Bell monopoly system was in tension with federal antitrust law, and over the years Bell defended an increasing number of antitrust suits brought by both private plaintiffs and the federal government. *See, for example, Pastor v. American Tel. & T. Co.,* 76 F.Supp. 781 (S.D.N.Y.1940); *Carter v. American Tel. & Tel. Co.,* 365 F.2d 486 (5th Cir.1966); *Litton Systems, Inc. v. American Tel. and Tel. Co.,* 700 F.2d 785 (2nd Cir.1983). Finally, in the mid–1980s, Bell settled one such suit through a massive divestiture. William J. Quirk and Fred A. Walters, *A Constitutional and Statutory History of the Telephone Business in South Carolina,* 51 S.C. L.Rev. 290, 336 (2000). The consent decree divided the country into "local access and transport areas," or "exchanges," and split Bell up into a number of local operating companies and one long distance carrier. Huber, *Federal Telecommunication,* at § 4.5.8.2. The local operating companies provided only local telephone service—service within the ex-

changes. Joseph D. Kearney, *From the Fall of the Bell System to the Telecommunications Act: Regulation of Telecommunications under Judge Greene,* 50 Hastings L.J. 1395, 1414 (1999). They were not allowed to provide inter-exchange (also called long-distance) service. *Id.* at 1413 n.53. Long-distance service providers (also called interexchange carriers) would provide services by paying the local companies for "equal access" to their telephone lines. *Id.* at 1413; *Great Lakes Communication Corp. v. Iowa Utilites Bd.,* No. C09–4085–DEO, 2009 WL 3806176, at *1 (N.D.Iowa Nov. 10, 2009) (equating "long-distance companies" with "interexchange carriers"). The payment amounts were set by either tariffs filed with the F.C.C., for interstate traffic, or by the relevant state's law. *See* 47 U.S.C. § 203(a); Brief for the Federal Communications Commission as Amicus Curiae at 4, *Central Telephone Company of Virginia, Inc. v. Sprint Communications Co.,* 715 F.3d 501, 508–10 (4th Cir.2013) ("The access charges associated with interstate calls traditionally are specified in tariffs filed with the F.C.C.; access charges associated with intrastate calls traditionally are specified in tariffs filed with the state regulatory commissions."). This system assumed that the market for local telephone services was naturally monopolistic, but that the long-distance service market could be competitive. Huber, *Federal Telecommunications,* at § 4.5.7. The local monopolies were therefore permitted, but their influence over long-distance services limited. *Id.*; Kearney, *From the Fall of the Bell System,* at 1417.

The F.C.C. recognized one significant exception to the access charges system. Telecommunications law had already distinguished between services which transmit information and services which somehow modify that information. Huber, *Federal Telecommunications,* at § 12.1;

*In the Matter of Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities (Computer I)*, 28 F.C.C.2d 267, 267–68. n.3 (1971) (distinguishing between communications services and "data processing services," defined to include "storing, retrieving, sorting, merging and calculating data"); *compare* 47 U.S.C. § 153(53) (defining telecommunications service) *with* 47 U.S.C. § 153(24) (defining information service). The former are called "basic services" or "telecommunications services," while the latter are referred to as "enhanced services" or "information services."[3] Huber, *Federal Telecommunications*, at §§ 12.2.1 & 12.2.2. Many information service providers, like interexchange carriers, need to purchase access to local telephone lines. In the 1980s, the F.C.C. exempted them from the tariffs that applied to interexchange carriers. *Connect America Fund*, 26 F.C.C. Rcd. 17663, 18016 n. 1959 (2011). They could instead pay the same rate that the local telephone company charged other business subscribers. *Id.* at 18016. That arrangement was called the "ESP exemption." *Id.* at 18016 n. 1959.

## C. The Telecommunications Act

Congress ended the local monopoly system in 1996, by passing the Telecommunications Act. *AT & T Corp.*, 525 U.S. at 371, 119 S.Ct. 721 ("Technological advances ... have made competition among multiple providers of local service seem possible, and Congress recently ended the longstanding regime of state-sanctioned monopolies."). The local companies had monopoly power in part because they controlled the industry's physical infrastructure. Huber, *Federal Telecommunications*, at § 5.5. The Act therefore requires local telephone companies, now called "local exchange carriers," to allow competitors to use their infrastructure. 47 U.S.C. §§ 153(32) & 251(b).

It also changes the way local exchange carriers are paid for access to their telephone lines. Instead of the old tariff system, § 251(b)(5) requires local carriers to negotiate rates. 47 U.S.C. § 251(b)(5). But that change did not go into effect universally. Section 251(g) preserved part of the pre-Act regulatory framework until the F.C.C. "explicitly superseded" it. 47 U.S.C. § 251(g). Specifically, it required local exchange carriers to continue providing access to "interexchange carriers and information service providers" on the same terms as they had before the Act. *Id.* The F.C.C. did not "explicitly supersede[ ]" those arrangements until 2011. *See Connect America Fund*, 26 F.C.C. Rcd. at 17923.

The Act altered the division of power between the federal government and the states. The Telecommunications Act did not repeal the Communications Act; the statute still explicitly limits the F.C.C.'s jurisdiction to interstate communication. 47 U.S.C. § 152(b). But it also gives the F.C.C. authority "to carry out the provisions of this chapter," which now includes regulations on local carriers. 47 U.S.C. § 201(b); *AT & T Corp.*, 525 U.S. at 377–78, 119 S.Ct. 721. The F.C.C. immediately interpreted the Act to give it authority over intrastate communications, and the Supreme Court agreed. *AT & T Corp.*,

---

**3.** This opinion will treat "basic services" as a synonym for "telecommunications services" and "enhanced services" as equivalent to "information services," even though the terms have slightly different meanings. *See* Huber, *Federal Telecommunications*, at §§ 12.2.1 & 12.2.2; *Implementation of the Non–Account-ing Safeguards of Sections 271 and 272 of the Communications Act of 1934*, F.C.C. Rcd. 21905, 21955–21956 (1996); *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 992, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). The differences are not relevant to this case.

525 U.S. at 378, 119 S.Ct. 721. "With regard to the matters addressed by the 1996 Act," Congress "unquestionably" took "the regulation of local telecommunications away from the states." *Id.* at 378, 119 S.Ct. 721 n. 6.

At the same time, the Act preserved broad state authority. States can regulate "to further competition" as long as their regulations are consistent with the Act and with the F.C.C.'s regulations. 47 U.S.C. § 261. The F.C.C. cannot abrogate state regulations that are consistent with the Act and with the F.C.C.'s implementation. 47 U.S.C. § 251(d)(3). And the Act delegates important responsibilities to the states: state commissions must approve access agreements, and can act as arbitrators and mediators when carriers' negotiations fail. 47 U.S.C. § 252. The result is an "unusual regime of cooperative federalism." *Southern New England Telephone Co. v. Comcast Phone of Connecticut, Inc.,* 718 F.3d 53, 58 (2nd Cir.2013); *AT & T Corp.,* 525 U.S. at 385 n. 10, 119 S.Ct. 721 (describing the Telecommunications Act as a "decidedly novel" scheme involving both federal and state authority).

## II. Factual Background

Windstream is a local exchange carrier serving an exchange in Iowa. At some point after the 1996 Telecommunications Act was passed, Sprint began purchasing access to Windstream's telephone lines. The relevant part of the traffic Sprint sent to Windstream's lines was generated by VoIP calls placed in a different ex-

change within Iowa. Those calls traveled to their destination in three stages. First, an MCC Telephony of Iowa (here called "Mediacom," because it was a Mediacom affiliate) customer would place a call using Mediacom's VoIP service. That service was a fixed VoIP service. At this stage, the call would be formatted as internet traffic. In the second stage, Mediacom would pass the call to Sprint's telecommunications network. Sprint would convert the call to the formatting used by telephone lines, then send the call onto Windstream's lines. In the third stage, Windstream would deliver the call to its intended recipient.

From the beginning of this arrangement until 2009, Sprint paid Windstream at rates set in a tariff Windstream had filed with the Iowa Utilities Board, a tariff enforced by state law. But in June 2009, Sprint stopped paying, arguing that its VoIP traffic was not subject to access charges. Windstream was not the only company to have problems with Sprint during that period. A nationwide rash of litigation broke out in 2008 and 2009, with Sprint refusing to pay bills on a variety of rationales. *See Central Telephone Co. of Virginia v. Sprint Communications Co. of Virginia, Inc.,* 759 F.Supp.2d 789, 792, 797 (E.D.Va.2011) (attributing Sprint's actions to a cost-cutting effort and finding that its reasons "frankly ... defy credulity").[4] Windstream threatened to stop providing service to Sprint, and the parties took their dispute to the Iowa Utilities Board.

---

4. *See also Centurytel of Chatham LLC v. Sprint Communications Co., LP,* No. 09–CV–1951, 2010 WL 5648871 (W.D.La. Dec. 15, 2010); *Line Systems, Inc. v. Sprint Nextel Corp.,* No. CIV.A. 11–6527, 2012 WL 3024015 (E.D.Pa. July 24, 2012); *Minnesota Independent Equal Access Corp. v. Sprint Communications Co., L.P.,* No. CIV. 10–2550 MJD/SER, 2011 WL 3610434 (D.Minn. Aug. 15, 2011); *North County Communications Corp. v. Sprint Communications Corp.,* No. 09–CV–02685 BEN,

2010 WL 3767595 (S.D.Cal. Sept. 21, 2010); *Iowa Network Services, Inc. v. Sprint Communications Company, L.P.,* No. CIV.A. 09–2393–CM, 2009 WL 3414835 (D.Kan. Oct. 20, 2009); *Brandenburg Telephone Company v. Spring* [sic] *Communications Co., L.P.,* No. 3:09–CV–00109, 2009 WL 3172071 (W.D.Ky. Sept. 29, 2009); *Sprint Communications Co., L.P. v. Native American Telecom, LLC,* No. CIV. 10–4110–KES, 2010 WL 4973319 (D.S.D. Dec. 1, 2010).

### III. PROCEDURAL HISTORY

Sprint asked the Iowa Utilities Board to protect its access to Windstream's lines, but argued that it did not have jurisdiction to resolve the underlying dispute: in Sprint's view, only the F.C.C. could decide what rates Sprint had to pay. The Board disagreed, and ordered Sprint to pay Windstream the amounts set by state law. Sprint sought review in Iowa district court and simultaneously filed suit with this Court, asking the Court to declare that the Board's decision violated federal law and to enjoin the Board's order. Windstream and Iowa's Office of Consumer Advocate intervened as defendants in this Court.

Since then, the Court has twice considered and granted motions to dismiss. It first deferred to the pending state-court proceeding, invoking *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Supreme Court ultimately reversed that decision. *Sprint Communications Co. v. Jacobs,* —— U.S. ——, 134 S.Ct. 584, 588, 187 L.Ed.2d 505 (2013). While those appeals proceeded, the Iowa District Court for Polk County upheld the Board's decision. *Sprint Comm'ns. Co. v. Jacobs,* No. 05771 CVCV008638, at *15 (Iowa D. Ct. Polk County September 16, 2013). When the case returned to this Court, the Court dismissed on issue preclusion grounds. The Eighth Circuit reversed and remanded. *Sprint Communications Co., L.P. v. Jacobs,* 798 F.3d 705, 709 (8th Cir.2015). The case is now once again before the Court, this time on the parties' cross-motions for summary judgment. The parties agree that there are no genuine disputes of material fact; they ask the Court to resolve the legal issues presented.

### IV. STANDARD OF REVIEW

"Summary judgment is proper where there is a question of law but no issue of facts." *Aho v. Erie Min. Co.,* 466 F.2d 539, 541 (8th Cir.1971). Because there is no genuine dispute of fact in this case, the Court must determine which movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a).

■ The Iowa Utilities Board has made legal determinations relevant to this case. While federal courts acknowledge state commissions' institutional competence, they do not defer to state agency applications of federal law. *See MCI Telecommunication Corp. v. Bell Atlantic Pennsylvania,* 271 F.3d 491, 516 (3rd Cir.2001); *Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1496 (9th Cir.1997) ("A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes."). This Court therefore applies federal law *de novo. Qwest Corp. v. Minnesota Public Utilities Com'n,* 684 F.3d 721, 725 (8th Cir.2012).

### V. ANALYSIS

■ Sprint argues that the state tariffs were invalid because the Telecommunications Act of 1996 preempted state regulation of payments to local exchange carriers. There are three kinds of preemption: express preemption, field preemption, and conflict preemption. *Cipollone v. Liggett Group,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Express preemption occurs when a statute's language explicitly preempts state law. *Id.* Field preemption exists when "federal law so thoroughly occupies a legislative field ... that Congress left no room for the States to supplement it." *Id.* (internal quotation omitted). And conflict preemption occurs when state law "actually conflicts" with federal law. *Id.* Neither express nor field preemption is at issue here. The Telecommunications Act does not explicitly preempt state law, and it does explicitly approve non-conflicting state regulation. *See* 47 U.S.C. § 261.

This case therefore turns on whether Iowa's tariff system conflicts with the Telecommunications Act's regulations on local exchange carriers.

## A. Limits on Federal Jurisdiction

The defendants argue that the Telecommunications Act does not apply to the calls at issue in this case. Those calls were intrastate, and the defendants claim that the Act preserves state authority over intrastate communications. They point to § 251(d)(3), which limits F.C.C. regulation of state commissions, to support their argument. The Supreme Court has already soundly rejected that conclusion. *AT & T Corp.*, 525 U.S. at 378 n. 6, 119 S.Ct. 721 ("[T]he question in these cases is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has."). And § 251(d)(3) does not support the defendants' position, for two reasons. First, the provision on its face limits the F.C.C.'s authority. 47 U.S.C. § 251(d)(3) ("[T]he Commission shall not preclude the enforcement of any regulation ... of a State commission that [meets three criteria]."). This case is not about the F.C.C.'s authority; no party is arguing that an F.C.C. regulation preempted state law. The question is whether the Act itself—its plain text—overrode state regulation. Second, the provision only protects state regulations that are "consistent with the requirements of this section." 47 U.S.C. § 251(d)(3)(B). If the state law at issue here contradicted another of § 251's provisions, then (d)(3) did not protect it.

## B. Applicable Federal Law

Once it is clear that federal law does apply to the traffic at issue here, the next question is what provision controls. On its face, § 251(b)(5) applies. That provision requires local exchange carriers to negoti-ate compensation arrangements "for the transport and termination of telecommunications." Windstream was a local exchange carrier, and it was terminating telecommunications on Sprint's behalf, apparently putting it in (b)(5)'s purview. But 251(g) limits 251(b)(5): if 251(g) applies, then Windstream had the same "restrictions and obligations ... that appl[ied]" before the Telecommunications Act took effect. 47 U.S.C. § 251(g). § 251(g) covers local exchange carrier services if two requirements are met. First, the service must be "exchange access, information access, [or] exchange services." *Id.* Second, the service must be provided to "interexchange carriers [or] information service providers." *Id.*

The parties here agree that Windstream provided Sprint with "exchange access." And all parties concede the facts necessary to classify Sprint as an "interexchange carrier:" they agree that Sprint received traffic from one telephone exchange and transported it to a different exchange. Sprint argues that it was an "information services provider," because the traffic it carried came from an information service. Addressing that question is unnecessary. Using either classification, 251(g) applied to the traffic at issue here. The question then becomes how this type of traffic was regulated before the 1996 Act.

## C. Pre–Telecommunications Act Regulation

Before the Telecommunications Act was passed, federal law only controlled interstate communications. 47 U.S.C. § 152. That implies that federal law cannot have preempted state regulation of intrastate communications, like those at issue here. Sprint makes two arguments against that conclusion. First, it claims both that VoIP is an information service and that the federal ESP exemption applied to all informa-

tion services (then called enhanced services), even when their communications were intrastate. Second, it argues that the impossibility exemption covered this VoIP traffic, giving the F.C.C. exclusive jurisdiction over the traffic.

*1. Intrastate enhanced services were not federally regulated.*

Sprint has not cited and this Court has not found any authority specifying that the ESP exemption covered both interstate and intrastate communications. The F.C.C. has in fact described the exemption as covering "providers of interstate services." *Amendments of Part 69*, 3 F.C.C. Rcd. 2631, 2631 (1988). That is unsurprising, because before 1996, the F.C.C. had no authority to regulate intrastate enhanced services. 47 U.S.C. § 152(b); *People of State of Cal.*, 905 F.2d at 1240 (holding that intrastate enhanced services were "squarely within the regulatory domain of the states"). Sprint's first argument is therefore unpersuasive.

*2. VoIP services were not all federally regulated.*

In *Vonage Holding Corp.*, the F.C.C. applied the impossibility exception to one VoIP service, and said it would preempt state regulation of services with similar "basic characteristics." *Vonage Holdings Corp.*, 19 F.C.C. Rcd. at 22424. But that VoIP service was nomadic; its users could call anyone from anywhere with Internet. *Id.* at 22419. It was "designed to overcome geography." *Id.* This case's service was fixed; the users could call Iowa locations from other Iowa locations. The F.C.C. has explicitly said that *Vonage*'s reasoning does not apply to providers "with the ability to track the jurisdictional confines of customer calls." *Universal Service*, 21 F.C.C. Rcd. 7518, 7546 (2006). Such providers are "subject to state regulation." *Id.* Sprint's second argument therefore also fails.

## VI. CONCLUSION

The Court holds that federal law did not preempt the state tariffs Sprint was charged under, because the tariffs did not conflict with federal law. In reaching that conclusion, the Court does not decide whether VoIP is an information service, or whether Sprint was an information service provider. Under any answer to those questions, Sprint's arrangement with Windstream was governed by 47 U.S.C. § 251(g), which in turn preserved state authority to regulate the arrangement.

For these reasons, Sprint's Motion for Summary Judgment is **DENIED** and Windstream's and the Iowa Utilities Board's members' Motions for Summary Judgment are **GRANTED**. The Court denies Sprint's requests for declaratory and injunctive relief. The Clerk shall enter judgment accordingly.