In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3807

SPRINTCOM, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

COMMISSIONERS OF THE ILLINOIS COMMERCE COMMISSION, and
ILLINOIS BELL TELEPHONE CO.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 6565 — **Edmond E. Chang**, *Judge*.

ARGUED MAY 19, 2015 — DECIDED JUNE 23, 2015

Before POSNER, EASTERBROOK, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. The Telecommunications Act of 1996, 47 U.S.C. §§ 151 *et seq*., sought (so far as relates to this case) to encourage competition in local telephone service. 110 Stat. 56, preamble. Companies that had once been the local subsidiaries of AT&T, such as Illinois Bell, but that had become independent when AT&T was broken up in 1984 (or

successors to those companies) were believed, despite the
competition of MCI and GT&T in many parts of the country,
to have near monopolies of local telephone service because
of the heavy costs that a competitor would have to incur to
duplicate the cables, switches, and other transmission infra-
structure owned and operated by each Bell company (offi-
cially called a "Regional Bell Operating Company"). Indeed,
before 1996 the dominant local carriers (almost all Bell com-
panies) earned more than 99 percent of the telecommunica-
tions revenue generated in local telecommunications mar-
kets. Federal Communications Commission, Industry Analy-
sis Division, Common Carrier Bureau, "Local Competition"
12 (1998), https://transition.fcc.gov/Bureaus/Common_Car
rier/Reports/FCC-State_Link/IAD/lcomp98.pdf (visited June
17, 2015).

If the existing infrastructure could handle the entire local
demand for telephone service, a new entrant, needing to cre-
ate its own infrastructure, might be unable to charge prices
that would recover the costs of that infrastructure. The mo-
nopolist would have recovered its infrastructure costs and
could therefore charge a remunerative price lower than any
new entrant, since the new entrant would have to charge a
price that covered not only its marginal costs but also its
fixed costs, that is, the costs of building an infrastructure
competitive with the monopolist's (though there would be
instances in which an established monopolist had to incur
substantial costs to update and repair its infrastructure while
new entrants could build out their networks at lower cost
because costs tend to fall as technology advances). Alterna-
tively, the monopolist could either refuse to connect its net-
work to that of the new entrant or agree to do so only on ex-
orbitant terms; that would prevent the entrant's customers

from reaching the monopolist's large customer base and would thus severely limit the entrant's ability to attract customers. See *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report & Order, 11 FCC Rcd. 15499, 15508–09 (1996). It is no surprise, therefore, that studies evaluating the effectiveness of the 1996 Act in promoting local competition have yielded at best mixed results. See, e.g., Donald L. Alexander & Robert M. Feinberg, "Entry in Local Telecommunication Markets," 25 *Review of Industrial Organization* 107 (2004); Jaison R. Abel, "Entry into Regulated Monopoly Markets: The Development of a Competitive Fringe in the Local Telephone Industry," 45 *Journal of Law & Economics* 289 (2002).

A telephone company that before the breakup of AT&T was the monopolist in a local market is called an "incumbent local exchange carrier" and is usually a Bell company once owned by AT&T but since the breakup independent. Such a carrier, like Illinois Bell (which does business under the name "AT&T" but which we'll call "Illinois Bell" to distinguish it from its former parent), provides telephone service in a local area; a carrier that provides long-distance service is called an interexchange carrier, because it carries calls between local exchange areas.

These local exchange carriers might have remained monopolists of local telephone service had not the 1996 Telecommunications Act required them to interconnect with new entrants (indeed with any "requesting telecommunications carrier") by giving them access to the cables and switches and other equipment that bring telephone service to buildings in the company's market area (the "exchange area" in telecom jargon). 47 U.S.C. § 251(c)(2). (Some inter-

connection obligations predated the 1996 Act, however. See *United States v. American Telephone & Telegraph Co.*, 552 F. Supp. 131 (D.D.C. 1982).) So, were Sprint a new entrant in Chicago and wanted its subscribers to be able to call at competitive rates people who were subscribers to Illinois Bell rather than to Sprint, it could require Illinois Bell to allow it to connect its modest infrastructure of cables and so on to Illinois Bell's infrastructure. A Sprint caller would dial a Bell customer and the call would travel to the latter through the interconnected transmission systems of the two carriers.

To make the interconnection requirement as inexpensive for new entrants as possible, the FCC further forbade local exchange carriers to charge not just rates that exceeded a "just and reasonable" price for interconnection—a common regulatory formula—but also rates that exceeded "TELRIC" rates (we'll spare the reader the uninformative words behind the acronym). 47 C.F.R. §§ 51.501, 51.503. Such a rate, generated by a complicated regulatory formula, see 47 C.F.R. § 51.505; *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 495–96 (2002), that we can ignore, is only slightly above the monopolist's marginal cost (the cost that the last call made adds to the company's total costs, as distinct from average cost, which might be substantially higher). Indeed TELRIC rates sometimes are below even the carrier's marginal cost because they are required to be based on the most advanced telecommunications technology, which the local monopolist may not be using. In *Verizon Communications, Inc. v. FCC, supra*, 535 U.S. at 489, the Supreme Court described TELRIC rates as being just above the confiscatory level.

Advances in telecommunications technology since 1996 have greatly reduced the dependence on the Bell incumbents

of what were then conceived to be new entrants into local telephone markets but are now—Sprint certainly—established competitors. But they continue to use Bell transmission facilities where they can, because TELRIC rates are such a bargain.

This case concerns Sprint's desire to expand its access to Illinois Bell's infrastructure at TELRIC rates even when Sprint customers make calls to, or receive calls from, persons outside the region (Illinois) in which Illinois Bell operates. Sprint invokes "the duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network for the transmission and routing of telephone exchange service and exchange access." 47 U.S.C. § 251(c)(2)(A). This could be read to mean just that at Sprint's request Illinois Bell must allow Sprint to connect its lines to Illinois Bell's lines, enabling a Sprint subscriber to phone any user of Illinois Bell's network, with Sprint being charged only the TELRIC rate for connecting its network to the Bell company's network in order to enable the call. But suppose that Illinois Bell's lines connect not just to its subscribers and to carriers such as Sprint that use Bell's lines to reach Bell subscribers, but also to an interexchange carrier. If a Sprint subscriber places a long-distance call, Sprint can route the call through Illinois Bell en route to the interexchange carrier, and it claims that Illinois Bell can charge only the TELRIC rate for making this connection. (It does not argue that the rate Illinois Bell does charge, though higher than the TELRIC rate, is not just and reasonable.) It asked Illinois Bell to make an interconnection agreement with it that would so provide. Illinois Bell refused, citing a regulation by the Federal Communications Commission that defines interconnection as "the linking of

two networks for the *mutual* exchange of traffic," 47 C.F.R. § 51.5 (emphasis added), implying that interconnection is limited to communications between Sprint customers and Illinois Bell customers.

That was only one of the requests that Sprint made to Illinois Bell. There was a second, of limited significance, as we'll see; and a third. Illinois Bell refused all three. (Sprint made other requests as well, but they are not before us.) It asked the Illinois Commerce Commission to arbitrate its disputes with the Bell company; arbitration of such disputes by the telecommunications agency of the state in which the Bell company that is a party to the dispute operates is the prescribed method of resolving such disputes. See 47 U.S.C. § 252(b)(1). The Commission rejected Sprint's claims, and the district court in which Sprint sought judicial review of the Commission's decision affirmed that decision, precipitating this appeal to us. The appellants are various Sprint affiliates, unnecessary to discuss separately, and the appellees are the Commissioners (sued in their official capacity, meaning that the real defendant-appellee is the Commission itself) and Illinois Bell.

Before we consider the appeal we need to remark the aridity of the parties' briefs. They focus on the meaning of various regulatory terms abstracted from the regulated activities themselves; as a result we are given no sense of the actual stakes in the parties' disputes. We are not told what the TELRIC rates for interconnection with Illinois Bell are, how much they differ from the maximum "just and reasonable" rates that Illinois Bell claims to be entitled to charge (and is currently charging), what the effects on competition, entry, service quality, and telecommunications costs to sub-

scribers would be were we to grant the relief sought by Sprint, or how much it would cost Sprint to connect its subscribers to long-distance carriers by leasing capacity on lines owned by companies other than Illinois Bell, or to build its own connections to the long-distance carriers. Neither side has tried to motivate us to decide the case in its favor by explaining how the decision that it advocates would further the goals of federal regulation of the contemporary telecommunications industry. The factual vacuum in which we are asked to decide Sprint's appeal works to the particular disadvantage of that company by confining it to arguing semantics rather than economic realities, thus leaving us to wonder whether Sprint is seeking anything from us other than windfalls at the expense of Illinois Bell.

Against this rather blank background we turn to Sprint's first argument, which we need to describe with somewhat greater precision. Sprint is conceded to be entitled to pay only TELRIC rates for using Illinois Bell's infrastructure to route a call to a subscriber to the Bell company's telephone service. It may also be entitled to use the Bell company's infrastructure at TELRIC rates when a Sprint customer calls a customer of any local exchange carrier, which need not be Illinois Bell, in Illinois Bell's exchange area (as held in *Southern New England Telephone Co. v. Comcast Phone of Connecticut, Inc.*, 718 F.3d 53 (2d Cir. 2013))—though this we needn't decide. That area, by the way, is all of Illinois, despite Illinois Bell's being designated a "local exchange carrier." Its alternative designation as a "Regional Bell Operating Company" is more descriptive, since its area of operations is an entire state, and one doesn't think of an entire state (with the possible exception of Rhode Island) as a "local area."

If a Sprint customer in Chicago calls an Illinois Bell customer in Carbondale, which though many miles south of Chicago is still in Illinois and therefore in Illinois Bell's "local exchange area," and the call goes at least part of the way over Illinois Bell lines, Illinois Bell can charge Sprint only the TELRIC rate for connecting the caller to Illinois Bell's network (the connection facilities are called "entrance facilities"). This enables Sprint to compete with Illinois Bell throughout the latter's service area by use of that company's facilities at very low cost. That was what the 1996 Act sought: making the Bell companies' facilities available at a very low cost to companies seeking to become viable competitors of the Bell company in that company's "local" (really regional) exchange area (i.e., market), which in this case, to repeat, is the State of Illinois.

What Sprint now seeks is the right to use Illinois Bell's facilities at TELRIC rates to connect Sprint's subscribers to persons in other parts of the country by linking Sprint facilities via Illinois Bell facilities to the facilities of an interexchange carrier, which, recall, transmits calls from one local exchange area (such as Illinois) to another (such as Alabama). If a Sprint customer wants to call someone in Alabama, the call may go part way over Illinois Bell lines; but when it leaves Illinois it must go over the lines of an interexchange carrier to reach the intended recipient of the call in Alabama.

Sprint claims the right to pay only the TELRIC rate for the Illinois Bell portion of the transmission just instanced. But such a right, besides being in tension with the FCC's interpretation of "interconnection" as a mutual exchange of traffic between entrant and established carrier—in our ex-

ample the Alabama resident is not an Illinois Bell customer—would not comport with the concern that motivated the imposition of a very low ceiling (TELRIC) on the pricing of certain calls using Bell company facilities. That concern, as we noted earlier, was a belief that the Bell companies had monopoly power, and was alleviated by allowing a non-Bell company such as Sprint to use the facilities of a Bell company to compete with *that* company. Granted, a Sprint customer in Illinois might call a subscriber to a phone company in Alabama (which might be one of Alabama's two regional Bell operating companies, comparable to Illinois Bell, or one of the ten other phone companies in that state), and if as Sprint argues it's entitled to use Illinois Bell's facilities to lower the cost of reaching the Alabaman, that would be very nice for Sprint. But there is nothing to suggest that the 1996 Act, having given Sprint low-cost access at Illinois Bell's expense to Illinois Bell's subscribers, meant to force Illinois Bell to share its *entire* network with its competitors at TELRIC rates.

One effect of such a requirement would be to sap Illinois Bell's motivation to improve its network. As explained in *U.S. Telecom Association v. FCC*, 290 F.3d 415, 424 (D.C. Cir. 2002), "a regulated price below true cost will reduce or eliminate the incentive for an [incumbent local exchange carrier] to invest in innovation (because it will have to share the rewards with [the new entrants]), and also for a [new entrant] to innovate (because it can get the element cheaper as a UNE)"—an "unbundled network element," which is to say a part of an incumbent local exchange carrier's network that another carrier is entitled to demand access to at TELRIC prices. (More on unbundling below.) See also Jerry Hausman & J. Gregory Sidak, "A Consumer-Welfare Approach to the

Mandatory Unbundling of Telecommunications Networks," 109 *Yale Law Journal* 417 (1999). Many prices that seem to equate to cost have this effect. Some innovations pan out; others do not; and if parties who have not shared the risks are able to come in as equal partners on the successes and avoid having to pay for the losses, the incentive to invest is impaired.

This is where Sprint's unexplained failure to provide us with data bites its case the hardest. We are given no evidence on which to base a judgment that by having to pay just and reasonable rates rather than TELRIC rates in order to be allowed to use Illinois Bell facilities as part of a transmission from Illinois to a person in another state (and therefore outside Illinois Bell's local—actually regional—exchange area), Sprint will be meaningfully hindered in its ability to compete with Illinois Bell to attract Illinois customers. We are told nothing about the concentration of the Illinois telephone market or the feasibility of Sprint's linking its network to interexchange carriers directly or through companies other than Illinois Bell—options which would obviate the need for it to rely on Illinois Bell's network.

Sprint might seek succor under another section of the 1996 Act: 47 U.S.C. § 251(c)(3) requires incumbent local exchange carriers to provide to any requesting telecommunications company unbundled access to specific facilities, as opposed to the incumbent local exchange carrier's entire network, at TELRIC rates. See also 47 U.S.C. § 252(d)(1)(A)(i); 47 C.F.R. § 51.503. But there's a hitch: the FCC is tasked by 47 U.S.C. § 251(d)(2) with determining which network elements shall be subject to 47 U.S.C. § 251(c)(3). Section 251(d)(2) states that in making that determination "the Commission

shall consider, at a minimum, whether—(A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." This has been interpreted to allow the Commission to "withhold unbundling orders, even in the face of some impairment, where such unbundling would pose excessive impediments to infrastructure investment." *U.S. Telecom Association v. FCC*, *supra*, 359 F.3d at 580. If Sprint thinks it can prove that the prices that Illinois Bell is charging it to connect to long-distance carriers, using Illinois Bell facilities, is too high, it can try to convince the Commission, which so far has been unsympathetic to such claims. The Commission has decided to "impose[] [Section 251(c)(3)] unbundling obligations only in those situations where we find that carriers genuinely are impaired without access to particular network elements and where unbundling does not frustrate sustainable, facilities-based competition. … We now conduct an impairment analysis with respect to entrance facilities and find that the economic characteristics of entrance facilities … support a national finding of non-impairment." *In the Matter of Unbundled Access to Network Elements: Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Order on Remand, 20 FCC Rcd. 2533, 2535, 2610 (2005); see also *Talk America, Inc. v. Michigan Bell Telephone Co.*, 131 S. Ct. 2254, 2258–59 (2011). Sprint has not shown that it faces "genuine impairment" if denied access at TELRIC rates to Illinois Bell facilities.

The second argument that Sprint presses on us is that as long as some of its traffic carried by Illinois Bell qualifies for TELRIC pricing (that is, traffic from Sprint customers to sub-

scribers to Illinois Bell or other local exchange carriers in the same exchange area as Sprint—i.e., Illinois), Sprint can piggyback nonqualifying traffic on that qualifying traffic, thereby, it argues, making the nonqualifying traffic qualifying. In support Sprint unguardedly cites a regulation which states that "a carrier that requests interconnection [with a local exchange carrier such as Illinois Bell] solely for the purpose of originating or terminating its interexchange traffic [to the customers of such a carrier] … is *not* entitled to" interconnection at TELRIC rates, 47 C.F.R. § 51.305(b) (emphasis added), unless it demonstrates that such free riding is necessary to enable it to compete. Sprint, which has not so demonstrated, interprets the provision to mean that the converse must be true—that as long as it's not using the interconnection *solely* for interexchange traffic it's entitled to TELRIC rates for all traffic. There's no basis for that interpretation.

Sprint's last claim concerns the rate that the Federal Communications Commission allows Illinois Bell to charge it when a Sprint subscriber telephones an Illinois Bell subscriber, thereby using Illinois Bell facilities for a part of the transmission of the call. The allowed rate varies. For some calls Illinois Bell is allowed to charge the originating carrier (here Sprint) an "access" fee, which is higher than the normal rate. Exactly how much higher we don't know; but in 2008 the average access charge was 0.8 cents per minute, Federal Communications Commission, "Telecommunications Industry Revenues 2008," tab. 10 (Sept. 2010)—more than 100 times the rate Illinois Bell charges to complete non-access calls. Illinois Bell claims the right to charge the access fee whenever the call is between geographic regions ("major trading areas" in FCC-speak), while Sprint claims that the

access charge is permitted only when the originating carrier charges its subscriber an additional fee for placing the call.

In 1996, when the Telecommunications Act was passed, the industry practice was to charge a higher rate for long-distance calls—and calls between different geographic regions are long-distance calls. Nowadays, especially in the wireless market, which is the market in which Sprint operates, "postage stamp" pricing—pricing independent of distance—is common. Sprint has adopted postage-stamp pricing and argues that therefore none of the calls it places to Illinois Bell subscribers is subject to an access charge. (One might call Sprint's pricing system "super postage stamp." The price of the stamp is insensitive to distance but not to the weight of the letter, while Sprint's uniform price is constant no matter how many calls its subscriber makes.)

Why Illinois Bell's charge to Sprint for the leg of the call that it handles should depend on what Sprint charges its subscriber admittedly is obscure; but equally obscure is why Illinois Bell should charge more depending on where the call originates. If a Sprint customer in New York calls someone in Chicago, which is on the eastern border of Illinois, Illinois Bell will be handling only a minute part of the transmission, hardly justifying a higher charge than if the call had originated hundreds of miles to the south but in the same major trading area so that no access fee could be charged. It is no more costly for Illinois Bell to terminate a call that originated one mile away than one that originated 1000 miles away. See Jonathan Nuechterlein & Philip Weiser, *Digital Crossroads: Telecommunications Law and Policy in the Internet Age* 249 (2d ed. 2013).

But forced to choose, we side with Illinois Bell. Sprint's approach creates an incentive for phone companies to engage in postage-stamp pricing so that they would never have to pay access charges when placing calls from their subscribers to subscribers of other companies. Illinois Bell's approach, though equally arbitrary, has at least the virtue of not affecting how telephone companies decide to price their services.

The judgment of the district court, denying Sprint's petition to set aside the ruling of the Illinois Commerce Commission, is

AFFIRMED.