In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 16-1237

CBEYOND COMMUNICATIONS, LLC,

*Plaintiff-Appellant,*

*v.*

BRIEN J. SHEAHAN, *et al.,* in their official capacities as Commissioners of the Illinois Commerce Commission,

*Defendants-Appellees,*
*and*

ILLINOIS BELL TELEPHONE COMPANY d/b/a AT&T Illinois,

*Intervenor Defendant/Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 3731 — **Charles R. Norgle**, *Judge.*

———————————

ARGUED SEPTEMBER 14, 2016 — DECIDED OCTOBER 18, 2016

———————————

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge*. The plaintiff, Cbeyond, provides telephone and broadband telecommunications service to small and medium-sized business customers in Illinois. It endeavors to send data through telephone lines with maximum efficiency. The principal defendant, a local exchange carrier that the parties mainly refer to as AT&T Illinois, provides telecommunications service similar to Cbeyond's but on a much larger scale. The two firms' networks are interconnected; federal law entitles a new entrant (Cbeyond entered the Illinois market in 2005) to connect with existing local exchange carriers on terms favorable to the entrant so that it can serve more customers without having to create its own network. See 47 U.S.C. § 251; *Sprintcom, Inc. v. Commissioners of Illinois Commerce Commission*, 790 F.3d 751, 753–54 (7th Cir. 2015); *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 328 (7th Cir. 2000). Those terms are in the first instance negotiated by the local exchange carrier and the new entrant, see 47 U.S.C. § 252(a)(1), but if the parties are unable to agree on terms the issue is referred to arbitration. 47 U.S.C. § 252(b). Whatever agreement emerges either from voluntary negotiations or from arbitration must be submitted to a state commission (in this case the Illinois Commerce Commission) for approval. § 252(e).

In 2004 the commission approved the agreement that Cbeyond and AT&T Illinois had worked out. Any party who wishes to dispute or enforce its interconnection agreement may file a petition with the state commission and if it loses there may sue in federal district court to determine whether the commission's approval is consistent with the rules that 47 U.S.C. §§ 251(b) and (c) impose on local exchange carriers, such as AT&T Illinois. And that is what Cbeyond did eight years later: file a complaint with the Illinois Commerce

Commission (actually part of a complaint that it had filed the previous year, a detail we can ignore) against AT&T Illinois, complaining that when Cbeyond leases new circuits from AT&T Illinois that are called digital signal level 1 ("DS1") loops, AT&T Illinois overcharges it by charging a separate price for the "Clear Channel Capability" ("CCC") built into the loops.

Invented in 1980, CCC is a method of coding the electrical pulses in a transmission line to make the streaming of data through the line more efficient. See P. A. Johnson & D. R. Walker, "A Standard for Clear Channel Capacity," 90 *Telephone Engineer & Management* 112, 112 (August 15, 1986). Cbeyond argues that the price of new DS1 loops should cover CCC because there's no extra work involved in setting it up once AT&T Illinois has agreed to send a crew out to provision a new line. "Provisioning" in telecom-speak refers to all the measures that a carrier like AT&T Illinois must take to activate a service, and thus might include sending a crew to a customer's premises to install or repair or replace terminal equipment there, making hardware changes on the utility pole or at the transport office where all the telephone lines in an area code are bundled, or software changes, or whatever other changes are needed to make sure that everything is running smoothly.

But the only activities of AT&T Illinois that Cbeyond mentioned to the Illinois Commerce Commission were software updates, tests, and administrative changes, none of which contradicted or undermined, let alone invalidated, the interconnection agreement between AT&T Illinois and Cbeyond. And that agreement designates CCC as an "optional feature" available to Cbeyond from AT&T Illinois only "at

an additional cost" specified in the agreement's pricing schedule. It was that additional cost that AT&T Illinois charged Cbeyond for CCC.

Cbeyond claims that CCC should have been available to Cbeyond at no cost beyond that of provisioning the loops, because the cost of CCC is built into the cost of that provisioning. But CCC was deemed optional rather than integral to the loops that Cbeyond bought from AT&T Illinois, and indeed some of the loops didn't have CCC built into them, suggesting that the price of the loops did not include the full price of CCC. More to the point, the interconnection agreement was explicit that there would be "an additional cost" if the purchaser of loops from AT&T Illinois wanted CCC, even if the price of the loops included that cost. That was the deal.

Cbeyond goes on to complain that some of AT&T Illinois' other customers were charged less than Cbeyond for CCC—even nothing—for a predecessor of CCC called Alternate Mark Inversion ("AMI"). But as CCC is a more advanced product, it's not surprising that it should command a higher price; nor has Cbeyond shown that it's the only purchaser of CCC that pays the optional charge.

It doesn't help Cbeyond's case that its briefs are virtually devoid of facts. We are not told what the price of the DS1 loops is with and without the CCC add-on, how the prices differ from those paid AT&T Illinois by other telecommunications companies that buy such loops with or without CCC, how the capabilities of CCC differ from those of AMI, or why Cbeyond agreed to the contractual terms that have precipitated this litigation. All we know is that Cbeyond made a contract with AT&T Illinois that it later regretted and has

resorted to litigation in an effort to squirm out of the contract.

Cbeyond may be right that AT&T's charges are inconsistent with the well-known federal pricing standard called "TELRIC," see 47 C.F.R. § 51.505, which constrains incumbent carriers to lease network elements to newcomers (even just relative newcomers) like Cbeyond (which dates back to 2005) at a price just a bit higher than the incumbent's marginal cost. As far as we know, by 2016 Cbeyond's orders for CCC required no new hardware, or other embellishments of the product, and if so that would drive the marginal cost of CCC to zero; yet AT&T Illinois continued charging Cbeyond for CCC. But 47 U.S.C. § 252(a)(1) allows a new entrant and an incumbent to contract around TELRIC pricing, provided they create a "detailed schedule of itemized charges," and Cbeyond and AT&T Illinois did that. The Pricing Schedule in the agreement includes a charge for CCC that as far as we can tell was never amended or deleted.

So we can't find a violation of federal law by the Illinois Commerce Commission or AT&T Illinois. All we discern is a dispute over a price term in a contract, and the resolution of such a dispute, as of Cbeyond's other state-law claims, is a matter for state rather than federal law. *Illinois Bell Telephone Co., Inc. v. Global NAPS Illinois, Inc.*, 551 F.3d 587, 591 (7th Cir. 2008); *Illinois Bell Telephone Co. v. Worldcom Technologies, Inc.*, 179 F.3d 566, 572, 574 (7th Cir. 1999). Although a federal district court can resolve state-law disputes under its supplemental jurisdiction if (as in this case) it has original jurisdiction (in this case because of Cbeyond's claims), see 28 U.S.C. § 1367, exercising supplemental jurisdiction over the state-law claims in this case would require us first to decide

that the state (Illinois) cannot invoke its sovereign immunity—a doubtful proposition in light of *MCI Telecommunications Corp. v. Illinois Commerce Commission*, 168 F.3d 315, 320 (7th Cir. 1999), where we said that it was "clear that … federal courts may review a state commission's actions with respect to an agreement only for compliance with the requirements of § 251 and § 252 of the Telecommunications Act, *and not for compliance with state law*" (emphasis added). And state sovereign immunity to one side, Cbeyond has imposed an excessive and unnecessary burden on the district court by bringing this sloppy lawsuit, and should not be permitted to impose further on the district court or our court.

AFFIRMED